**FINOVA CAPITAL CORPORATION,**
**Plaintiff–Appellant,**

v.

**Anne C. REAM, O.D., P.C., Defendant–**
**Respondent.**

Nos. 27503, 27580.

Missouri Court of Appeals,
Southern District,
Division Two.

July 24, 2007.

John W. Moynihan, II, Sachnoff & Weaver, Ltd., Chicago, IL, John C. Holstein and James E. Meadows, Shughart Thomson & Kilroy, P.C., Springfield, for Appellant.

David B. Pointer and Raymond M. Gross, Pointer Law Office, P.C., Gainesville, for Respondents.

PHILLIP R. GARRISON, Judge.

This is a breach of contract case filed by Finova Capital Corporation ("Plaintiff") against Anne C. Ream, O.D., P.C. ("Defendant P.C.") arising from its lease of an electronic message board ("message board"). Plaintiff appeals a judgment entered, after trial to the court, in favor of Defendant P.C. and Anne C. Ream ("Ream").[1]

---

1. The named defendant in the suit was Anne C. Ream, O.D., P.C.; the answer referred to "her Answer"; and the judgment was for "Defendants Anne C. Ream, O.D. P.C. and Anne C. Ream, O.D." The distinction between the defendant named in the petition and those in whose favor the judgment was entered is not explained in the briefs and we see no explanation in the record. Since there is no issue about whether Ream was a party to this

In 1995, Ream, an optometrist and president of Defendant P.C., attended an optometrist convention and trade show where she saw and became interested in a message board displayed by Recomm International Display Ltd. ("Recomm"). Recomm's representative demonstrated the message board for Ream, explaining that it could be operated with a custom computer disc or with a basic disc that permitted the user to attach a keyboard and type in messages to be displayed by the board. The representative also demonstrated that if neither disc was inserted in the board, it displayed only a red light when turned on.

Thereafter, Recomm sent a representative to one of Defendant's business locations in West Plains, Missouri, where he met with Ream. On August 25, 1995, Ream signed, on behalf of Defendant P.C., three forms furnished by the Recomm representative: an acknowledgement, addressed to "Recomm's Designated Leasing Company," that the lease would be non-cancellable; a "Lease Application"; and a "Lease Agreement," which Ream also signed as personal guarantor. The Lease Application included a portion titled "Certificate of Acknowledgement and Acceptance of Leased Equipment," signed by Ream on behalf of Defendant P.C. that stated that Defendant P.C. acknowledged receipt of the equipment "described in its Lease with Lessor ... and accepts the Equipment after full inspection thereof as satisfactory for all purposes of the Lease"; and that "Lessor has fully and satisfactorily performed all covenants and conditions to be performed by Lessor." Defendant, however, did not have the message board when that was signed. When signed by Ream, the Lease Agreement showed the vendor as Recomm; the box entitled "Equipment Description" only had the "Qty: 1" filled in and the portion for "Serial Number" was blank. There was also a box on the Lease Agreement titled "Accepted: Lessor" that was blank. The blanks on those forms were filled in with handwriting in black ink. Ream gave the Recomm representative Defendant P.C.'s check payable to Recomm for the first lease payment when those documents were signed.

At some point after August 25, 1995, additions were made to the Lease Application and the Lease Agreement by a person or persons other than Ream, and apparently without her knowledge or consent.[2] The "Date of Lease" in the portion of the Lease Application titled "Certificate of Acknowledgement and Acceptance of Leased Equipment" was filled in with "9–5–95" in blue ink. Additionally, the Lease Agreement was amended by filling in "Recomm Advisory Board" and serial number "15053" in blue ink in the box titled "Equipment Description"; and additions were made to the box titled "Accepted: Lessor" in that an ink stamp stating "FINOVA Capital Corporation, 3601 Minnesota Drive + 960, Bloomington, MN 55435" was added as well as the signature, "Bill Anderson Ops. Dir." and the date of "9–5–95," also in blue ink. As indicated above, all of the writing on those documents when signed by Ream was in black ink.

A message board was shipped to Defendant, but it did not include a software diskette to make it functional other than to display a red light when it was turned on. Ream explained that "[w]hat I wanted it for was the messages. I have lighting in my office." No diskettes to make the equipment operational as a message board were ever delivered to Defendant P.C.

suit, we will treat the case as if she is. For this reason, Defendant P.C. and Ream will be referred to collectively as "Defendants."

2. Ream testified that she did not see the changes until after this litigation commenced.

Recomm, along with related companies, filed for bankruptcy protection pursuant to Chapter 11 of the United States Bankruptcy Code in January 1996 ("the bankruptcy"). At some point, Ream started calling Recomm attempting to return the message board because it did not work, but was told that Recomm had taken bankruptcy, making it unclear who to return the message board to. At the direction of a Recomm representative, Ream wrote Recomm a letter saying that the message board was not operational and that she needed help with the problem. While this was going on, Defendant P.C. sent lease payments to Plaintiff in October, November, and December 1995 as well as January 1996 pursuant to statements received. Defendant P.C. made no lease payments thereafter.

During the bankruptcy, Plaintiff, along with Recomm and other lease finance companies, filed a Plan of Reorganization referred to as the "Fourth Amended Joint Plan of Reorganization of the Debtors, the Official Committee of Unsecured Creditors and Certain Leasing Companies Under Chapter 11 of the Bankruptcy Code" ("the Plan"). The bankruptcy court later entered an order confirming the Plan ("Confirmation Order"). It is the Plan and Confirmation Order that Plaintiff in part relies on to establish trial court error in entering judgment for Defendants.

Plaintiff filed suit, in two counts, both of which were based on breach of contract. In allegations applicable to both counts, it alleged, *inter alia*, that Defendant P.C. is bound by the Plan and Confirmation Order, the latter being a final judgment that adjudicated the rights and liabilities of Plaintiff, Defendant P.C. and Ream regarding the lease and personal guarantee. It further alleged that the Confirmation Order modified the terms of the lease between Plaintiff and Defendant P.C.; adjudged that the lease, as modified was valid and binding on Defendant P.C.; released Plaintiff from any claims and defenses that otherwise may have been raised by Defendant P.C. in connection with the lease on matters occurring before June 30, 1998; and enjoined Defendant P.C. from raising any claim or defense against Plaintiff in connection with the lease on any matters occurring before June 30, 1998.

In the answer, Defendants alleged, *inter alia*, as an affirmative defense, that the transactions lacked consideration, in that an integral part of the signage equipment was computer software that was never delivered. As a result, Defendant P.C. alleged that it received no consideration for the contract.

■ This appeal arises from a judgment entered in favor of Defendants. As with other court-tried cases, our review is dictated by the standards set out in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), whereby the trial court's ruling is to be affirmed if it is supported by substantial evidence, is not against the weight of the evidence, and does not erroneously declare or apply the law.[3] We are to exercise the power to set aside a judgment on the ground that it is against the weight of the evidence with caution and with a firm belief that the decree or judgment is wrong. *Id.* Due regard is to be given to the opportunity of the trial court to have judged the credibility of the witnesses inasmuch as the trial court is free to believe or disbelieve all, part or none of the testimony of any witness. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 (Mo. banc 1989).

**3.** *Murphy* interpreted the provisions of Rule 73.01(c). The provisions of that Rule now appear in essentially the same form in Rule 84.13(d), Missouri Rules of Civil Procedure (2006).

When determining the sufficiency of the evidence an appellate court is to accept as true the evidence and inferences from the evidence that are favorable to the trial court's judgment and disregard all contrary evidence. *Id.* Where, as in this case, neither party requested findings of fact and conclusions of law, and none were entered, we must presume that all fact issues were found in accordance with the judgment. *Id.*

In its first point, Plaintiff contends that the trial court erred in entering the judgment, arguing that the Confirmation Order conclusively resolved that (1) Defendants' obligations under the lease were not subject to any demands or defenses, (2) Defendants released Plaintiff from any obligations, demands or defenses based on action, activities or events that occurred prior to the Fourth Amended Plan, and (3) upon the implementation of the Fourth Amended Plan, the reorganized debtor, In–Store Promotions, Inc., ("In–Store") was to provide the software Defendants claim, as the sole basis of their defense, was not furnished with the message board. Accordingly, Plaintiff argues that these issues were conclusively decided against Defendant P.C. and Ream.

Initially, we note that Defendants do not contest that the Plan and Confirmation Order applies to the lease as well as their relationship not only with Recomm, but Plaintiff as well. Instead, they disagree with Plaintiff over the interpretation and application of the Plan and Confirmation Order.

The dispute under this point can be narrowed to the following: Plaintiff argues that the Confirmation Order amounted to a complete release of any defenses Defendants may have had with regard to the lease; and Defendants contend that under the Order they would not have been able to raise any breaches of the lease that occurred prior to the Confirmation Order, but that Plaintiff had a continuing duty after the Confirmation Order to deliver the software necessary for the message board to function with anything other than a solid red light. Under this scenario, the result turns on the wording and interpretation of three subparagraphs of the Confirmation Order. They are, in pertinent part:

16. Except as specifically set forth in the Fourth Amended Plan, effective on the Effective Date:

(i) all Persons, including, but not limited to, each of the Debtors and the Estates, each of the Lessees, each of the Participating Lessors, . . . shall be deemed to unconditionally remise, release, and forever discharge the Participating Lessors, and each of them, . . . (hereinafter collectively the "Released Lessor Parties"), . . . of and from any and all manner of actions, causes of action, suits, claims, counterclaims, liabilities, obligations, defenses, and demands whatsoever, at law or in equity, if any, which any of them ever had, now has, or hereafter can, shall, or may claim to have against any of the Released Lessor Parties for or by reasons of any cause, matter, or thing whatsoever, arising from the beginning of the world to the Effective Date, relating to the business or operations of the Debtors, the Leases and the Advertising Contracts, . . .

(iii) the Leases as modified are valid and binding as between the Released Lessor Parties and Participating Lessees only in accordance with their terms and the obligations of the Participating Lessees thereunder are not subject to any claims, demands, defenses, set-offs, and counter-claims; provided that the foregoing provision should not be construed as an acknowledgement or admission by the Lessees as to the validity of

the Leases as between any parties other than the Released Lessor Parties and the Participating Lessees, and, except as provided by the Fourth Amended Plan, this Release shall not affect the claims of the Lessees against any individual or entity resulting from either the Leases or any other lease, and

(iv) each of the Lessees releases any causes of action, claims, suits, counterclaims, liabilities, obligations, defenses, and demands whatsoever, in law or in equity, if any, against the Released Lessor Parties with respect to the revised Leases resulting or arising out of actions, activities, or events occurring prior to the Confirmation Date, relating to the business or operations of the Debtors, the Leases and the Advertising Contracts.[4]

■ A confirmed plan of reorganization acts like a contract that binds the interested parties in the bankruptcy and will be interpreted as any other contract. *In re Machinery, Inc.,* 342 B.R. 790, 796 (Bankr.E.D.Mo.2006). Contract interpretation is a question of law which we review de novo. *Grand Investment Corp. v. Connaughton, Boyd & Kenter, P.C.,* 119 S.W.3d 101, 112 (Mo.App. W.D.2003). In doing so, we attempt to ascertain the parties' intention, looking only to the contract language unless the contract is ambiguous. *Id.* "A trial court should determine, as a matter of law, whether a contract is ambiguous and, therefore, requires extrinsic evidence to aid in its interpretation." *Id.* (quoting *Block v. N. Am. Sav. Bank, FSB,* 59 S.W.3d 567, 573 (Mo.App. W.D.2001)).

*Jacobs v. Georgiou,* 922 S.W.2d 765 (Mo. App. E.D.1996), involved the meaning of an order entered by a bankruptcy court in a Chapter 11 proceeding. Although the order in question was not one confirming a reorganization plan, as in the instant case, apropos to this case, the court said that "if the bankruptcy court order is plain and unambiguous as to [the matter which it addresses], that order is exclusively determinative." *Id.* Having found that the bankruptcy court order was ambiguous and inconsistent, the court said that "[c]onstruction of a court order is a question of law calling for the independent judgment of this court." *Id.* It also said:

> In construing this ambiguous judgment, our task is to ascertain the intention of the bankruptcy court in entering the order. It is also relevant that the bankruptcy court order was not the result of an adversarial proceeding, and as the bankruptcy judge himself noted, was in the nature of an uncontested consent decree. When interpreting a consent judgment, we endeavor to ascertain not only the intent of the court entering judgment, but the intentions of the parties. Construction of an ambiguous judgment is much like interpreting other ambiguous written instruments, in that we are required to search the entire record for clues in attempting to divine the intentions of the parties and the court.

*Id.* (internal citations omitted).

■ Because Defendants concede without argument that the bankruptcy court "curtailed the ability of either party to assert past non-compliance as a refusal to honor its contractual obligations from that point forward," they argue that it "does not purport to excuse ongoing noncompliance with this term or remove it from the lease." Thus presenting the issue of whether the Confirmation Order precludes Defendants from relying on noncompliance since it was entered.

---

4. Plaintiff is apparently a "Participating" and "Released" "Lessor," and Defendant P.C. is apparently a "Lessee" and "Participating Lessee" under the Confirmation Order.

In the first portion of this point, Plaintiff relies on the following italicized language from paragraph 16(iii) of the Order which states, in pertinent part:

> *the Leases as modified are valid and binding* as between the Released Lessor Parties and Participating Lessees only in accordance with their terms *and the obligations of the Participating Lessees thereunder are not subject to any claims, demands, defenses, set-offs and counter-claims;* . . . and, except as provided by the [Plan], this Release shall not affect the claims of the Lessees against any individual or entity resulting from either the Leases or any other lease[.]

Plaintiff contends that because of the italicized language, the Order "expressly validated the Lease, as modified, and eliminated all demands and defenses against the Lessee's obligations under the Lease." Thus, it argues that the Order "resolved that a Participating Lessee's payment obligation under the Lease was not subject to any claims, demands or defenses the Lessee would attempt to raise to avoid its payment obligation under the Lease" with the result that "Defendants' sole defense, that their payment obligations are subject to the future delivery of software, is precluded by the terms of the [Order]." Carried to its logical conclusion, this position would mean that Defendants would have no defense against its obligation to pay under the modified lease regardless of what Plaintiff did or did not do. Under this theory, Plaintiff could, for instance, take the equipment from Defendant P.C. without affecting the duty to pay under the lease.

In arguing that even though the Confirmation Order may have res judicata effect, it does not excuse Plaintiff's refusal to honor its ongoing obligations under the lease, Defendants rely on the language

from the above provision of the Order saying that "the Leases as modified are valid and binding as between the Released Lessor Parties and the Participating Lessees only in accordance with their terms." Thus, they contend that under the modified lease, all other terms and conditions, not inconsistent with the Plan, survived, which would include an ongoing duty to furnish the software required to make the sign functional as a message board.

Consistent with Defendants' contention is another provision of the Order providing that as of its "Effective Date," all persons including Lessees were permanently enjoined from asserting against the Released Lessor Parties, "any other or further claims or causes of action *based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.*" (emphasis added). The "Effective Date" of the Order was June 30, 1998. This, together with the fact that it would be inconsistent to also order that the Lessees must continue to pay under the modified leases regardless of whether the Lessors complied with their obligations under the modified leases after the Effective Date, lends credence to Defendants' argument. Also consistent with this conclusion is the fact that Plaintiff acknowledged, in a letter it sent to Defendant P.C. on June 30, 1998, concerning payment options under the modified Lease, that the Plan approved by the bankruptcy court "provides both the Participating Lessors (including [Plaintiff]) and the Participating Lessees (including you) with a release and injunction prohibiting the commencement or continuance of lawsuits brought by one against the other *relating to events occurring prior to confirmation.*" (emphasis added).

Further support of this contention is the fact that the lease was modified by the Order in that Defendant P.C.'s financial

obligation was altered by discounting the balance owing under the lease, changing the monthly payments, and providing that "[a]ll Participating Lessees shall commence payments under their revised Lease by paying their Revised Monthly Lease Payment on the first scheduled payment date under their original Lease following the Effective Date of the Plan." In keeping with that Order, Plaintiff sent Defendant P.C. a letter on June 30, 1998, giving it several payment options, and stating that the failure to select one would result in a presumed selection of Option 4. We gather from the record that Defendant P.C. failed to select one of the options with the result that Option 4 became applicable. That option provided that there were no amounts then due under the lease, and that Defendant P.C. would commence to make payments in August 1998. In other words, it appears that there was then a new beginning to the Lease.

The Plan that was approved by the Order also provided that "[e]xcept as otherwise set forth herein, all other terms and conditions of the Lease, not inconsistent with the terms herein, survive." For all of these reasons, to the extent Plaintiff argues that Defendants are universally and automatically precluded from defending its claim for lease payments based on breaches of the lease after the Effective Date of the Order, it is not well taken.

In the second subsection of its first point relied on, Plaintiff argues that any claim Defendants may have had for non-delivery of the software would have arisen in 1995 when the lease commenced, and would have been released by other releasing language of the Order. Thus, it points to the following from paragraphs 16(i) and (iv) of the Order:

> Except as specifically set forth in the [Plan], effective on the Effective Date: (i) All persons, including, but not limited

to, each of the ... Lessees, each of the Participating Lessors, ... shall be deemed to unconditionally remise, release, and forever discharge the Participating Lessors, and each of them, ... of and from any and all manner of actions, causes of action, suits, claims, counterclaims, liabilities, obligations, defenses, and demands whatsoever, at law or in equity, if any, which any of them ever had, now has, or hereafter can, shall, or may claim to have against any of the Released Lessor Parties for or by reason of any cause, matter, or thing whatsoever, *arising from the beginning of the world to the Effective Date*, relating to the business or operations of the Debtors, the Leases, ... (iv) each of the Lessees releases any causes of action, claims, suits, counterclaims, liabilities, obligations, defenses, and demands whatsoever, in law or in equity, if any, against the Released Lessor Parties with respect to the revised Leases *resulting or arising out of actions, activities, or events occurring prior to the Confirmation Date*, relating to the business or operations of the Debtors, [and] the Leases[.] (emphasis added).

Plaintiff argues that the Lease was executed in 1995, long before the Order was entered, and that while it does not admit that it ever had a duty to provide the software in question, any such obligation would have arisen in 1995. Because of the release language in the Confirmation Order quoted above, Plaintiff argues that even if it had an obligation to provide operating software, Defendants released it by reason of that Order.

Defendants, on the other hand, argue that the release language of the Confirmation Order does not purport to extinguish either party's obligations under the modified leases. They point out that the release language relied on by Plaintiff begins

with the language, "[e]xcept as specifically set forth in the [Plan]"; and that other release language in the Order begins with the words, "the Leases as modified are valid and binding as between the Released Lessor Parties and the Participating Lessees only in accordance with their terms."

■ The validity of this issue turns on whether a breach of the contractual duty under the lease creates one cause of action that would be extinguished by the release in the Confirmation Order, or whether the breach was of a recurring nature that would continue or could re-occur after the date of that Order. Neither party cites authority relating to that question. On the one hand, it would be appropriate for us to resolve this issue by noting that deficiency and applying the rule that it is appellant's responsibility to demonstrate error by citing appropriate and available precedent, or if none is available, explaining its absence. *Thummel v. King*, 570 S.W.2d 679, 687 (Mo. banc 1978). The failure to do either justifies the appellate court in considering a point abandoned. *Shiyr v. Pinckney*, 896 S.W.2d 69, 71 (Mo.App. S.D.1995). We may, however, make an ex gratia review for manifest injustice or miscarriage of justice warranting relief under Rule 84.13(c).[5]

Plaintiff argues that it never had an obligation to deliver the software to permit the equipment to be used as a "message" board. In argument before the trial court, Plaintiff admitted that it was responsible for delivering the sign, which it did, as evidenced by the fact that "you plug it in, you turn it on, it lights up. It delivered a working sign." Thus, Plaintiff's position is that Defendant P.C. was not entitled to receive the software necessary for the equipment to operate as a message board

because that is not specified in the description of the leased equipment; it has no responsibility here even though, after the lease was signed by Defendant P.C. and Ream, it unilaterally completed the description of the equipment to be delivered as a "Recomm Advisory Board," without mentioning the software necessary to make it functional for the purpose for which it was acquired; it had the responsibility to deliver the message board; and it delivered a message board that would only emit a red light when turned on.

■ Implied in every contract is a covenant of good faith and fair dealing, requiring that the performance and enforcement terms be carried out in good faith. *Schell v. LifeMark Hospitals of Missouri*, 92 S.W.3d 222, 229 (Mo.App. W.D.2002). The good faith obligation requires that contracting parties not prevent or hinder performance by the other party. *Id.* at 230. Thus, the covenant prevents one party to a contract from exercising a judgment conferred by the express terms of the agreement in a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract. *Envtl. Prot., Inspection, and Consulting, Inc. v. City of Kansas City*, 37 S.W.3d 360, 366 (Mo.App. W.D.2000). It is the duty of one party to a contract to cooperate with the other to enable performance and achievement of the expected benefits. *Slone v. Purina Mills, Inc.*, 927 S.W.2d 358, 368 (Mo.App.W.D.1996). A party may not utilize contract language that allows unilateral action to improperly deny the other party from expected benefits flowing from the contract. *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 412 (Mo.App. W.D.2000).

5. All references to rules are to Missouri Rules of Civil Procedure (2006) unless otherwise indicated.

 Even more apropos to this discussion is the fact that "[i]t is well-settled in Missouri that a party can bring successive claims on the same contract for damages that have not accrued as of the time of entry of judgment in the prior action." *WEA Crestwood Plaza v. Flamers Charburgers*, 24 S.W.3d 1, 9 (Mo.App. E.D. 2000). "An injured party may bring a succession of actions on breaches of a contract imposing a continuous duty which causes a steady accretion of damage." *Schuchmann v. Air Services Heating & Air*, 199 S.W.3d 228, 237 (Mo.App. S.D.2006)(citing *Finley v. St. John's Mercy Med. Ctr.*, 958 S.W.2d 593, 595 (Mo.App. E.D.1998)). "Thus, while a contract is still in existence, each time the defendant fails to perform in accordance with its provisions is a separate violation of its terms and gives rise to a new cause of action." *Id.*

In *Finley*, plaintiff brought suit on a disability policy and obtained a judgment for benefits to the date of the judgment. 958 S.W.2d at 594. She later brought a second suit for benefits, entitlement to which allegedly accrued after the first judgment. *Id.* One issue was whether the doctrines of res judicata, collateral estoppel or against splitting causes of action barred the second suit. *Id.* The appellate court held that the second suit was not barred, saying:

> [d]istinct causes of action may arise from a single contract, transaction or occurrence. A plaintiff is not barred from bringing two successive claims on the same contract where the second action had not accrued at the time the first was prosecuted ... An injured party may bring a succession of actions on breaches of a contract imposing a continuous duty which causes a steady accretion of damage. Thus, while a contract is still in existence, each time the defendant fails to perform in accordance

> with its provisions is a separate violation of its terms and gives rise to a new cause of action.

958 S.W.2d at 595 (internal citations omitted). The court noted also that the contract in question involved a continuing duty to pay, and that defendant breached that duty and plaintiff suffered new damages each month that plaintiff was entitled to benefits that were not paid. *Id.* With reference to collateral estoppel and res judicata, the court said:

> Collateral estoppel does not apply to bar the petition in [the second suit] because the issue decided in [the first judgment], plaintiff's entitlement to disability benefits up to the time of the [first judgment], is not the issue presented in [the second suit], which is plaintiff's post-judgment entitlement to disability benefits. Res judicata does not apply because the two claims involve two separate causes of action. Further, contrary to defendants' argument on appeal, there is no splitting of a cause of action.

*Id.* at 596.

Here, the record is clear that Defendant P.C. agreed to lease the message board for the purpose of displaying messages in its office area; and that purpose was prevented by the failure to receive the software necessary to facilitate its function other than as a solid red light. At any given point, the accumulation of additional damages could have been stopped by the delivery of the necessary software, but each day Defendant P.C. was without the software necessary for the equipment to function as a message board brought additional damage. We find no plain error under this portion of the point, and it is denied.

In the final subsection of its first point, Plaintiff contends that the trial court erred in entering the judgment because of anoth-

er provision in the Order. It argues that under the Plan, Recomm was to be reorganized through a merger into an entity known as In–Store, which would then be responsible for providing software to lessees "pursuant to a Promotion and Servicing Agreement that would 'supercede and replace' the Advertising Agreement with Recomm." Since Defendant P.C. refused to participate in the In–Store program after the bankruptcy, Plaintiff concludes that the failure to receive the software was a result of Defendant P.C.'s own inaction.

In support, Plaintiff cites *Landau v. St. Louis Public Serv. Co.*, 364 Mo. 1134, 273 S.W.2d 255, 258–59 (1954), for the principle that when one promissor repudiates the contract or manifests an intention not to perform, the duty of the other party is terminated. It also cites *Local Joint Executive Bd., Hotel & Rest. Employees and Bartenders Int'l Union v. Nationwide Downtowner Motor Inns, Inc.*, 229 F.Supp. 413, 417 (W.D.Mo.1964), for the principle that a party to a contract that creates a condition that causes the other party to default cannot use that default to eliminate the other party's rights.

The essence of Plaintiff's argument under this portion of point one is that under the Plan and Confirmation Order, In–Store was to be responsible for furnishing software for the message boards, but Defendant P.C. failed to participate in that plan, and therefore, cannot complain. This position is not well taken.

Under the Plan and the Order, there were different classes of claimants, including Class C and Class D. Plaintiff, in support of its present contention, points to the provisions of the Plan concerning Class C claims. Those claims consist "of all Claims of Holders that are Participating Lessees and parties to an Advertising Contract with the Debtors." As Plaintiff points out, under the Plan In–Store was to

continue providing services under Advertising Contracts previously entered into with Recomm. These were arrangements whereby the lessee agreed to display prearranged advertising on the message boards in return for a portion of the advertising revenue, and In–Store was to provide software.

Contrary to Plaintiff's claim, however, Defendant P.C. does not appear to have been part of Class C, but rather was Class D. Class D is described as consisting "of all Claims of Holders that are Participating Lessees that are not parties to an Advertising Contract with any of the Debtors." We are not directed to any portion of the record demonstrating that Defendant P.C. had entered into an "Advertising Contract" in connection with its lease, or that it had any obligation to look to In–Store for software, whether that be for purposes of third-party advertising or merely operating the message board.

Plaintiff contends that Defendant P.C.'s position that it was not a Class C creditor is at odds with its concession at trial that the In–Store provisions applied to it. In support, it points to a comment made by Defendant P.C.'s attorney in closing argument, that "the point [Plaintiff's attorney] has made about the monthly diskettes is well made, well founded and well taken. That's not what we're complaining about." This statement followed a statement by Plaintiff's attorney that Defendant P.C. didn't want to participate with In–Store, and didn't want them to send anything. Instead of the interpretation placed on the comments by Defendant P.C.'s attorney by Plaintiff, we interpret them as agreeing that Defendant P.C. did not want any arrangement with In–Store. This was apparently because Defendant P.C. had not originally had an Advertising Contract with its lease; Defendant P.C. did not want to participate in an Advertising Con-

tract whereby advertising by third parties was placed in its business location; and what it was complaining about was the failure to receive basic software that would permit it to display its own messages to customers. This portion of the point is not well taken and is denied. Point one is denied.

In Point II, Plaintiff contends that the trial court erred in entering the judgment for Defendants on its breach of contract claim because "parol evidence may not be considered by a court to construe an unambiguous contract, in that the trial court judgment found Plaintiff breached the lease by failing to deliver software, the only defense offered by Defendants at trial, despite the unambiguous lease term that the equipment included in the lease was the Recomm Advisory Board, which Defendants admitted they received." As we construe this point, Plaintiff relies on the fact that the Lease described the equipment being leased as a "Recomm Advisory Board," which it contends was an unambiguous description precluding parol evidence concerning its meaning; that is what Defendant P.C. received; and, therefore, Defendant P.C. received all it was entitled to.

■ Plaintiff cites *Dunn Indus. Group, Inc. v. City of Sugar Creek,* 112 S.W.3d 421, 428–29 (Mo. banc 2003), for the principles that a contract is not ambiguous merely because the parties disagree as to its construction; where a contract is unambiguous, the intent of the parties is to be gathered from the contract alone; and extrinsic evidence may not be introduced to vary or contradict the terms of an unambiguous agreement or to create an ambiguity. We do not disagree with any of those principles. The Supreme Court of Missouri, however, also said in *Dunn,* that "the cardinal principle of contract interpretation is to ascertain the intention of the

parties and to give effect to that intent"; "[t]he terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning"; "[a] construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense"; and "[a] contract is ambiguous only if its terms are susceptible to fair and honest differences." *Id.* at 428.

First, we note that Plaintiff does not direct us to any portion of the record indicating that the trial court relied on parol evidence in entering the judgment. In fact, the court noted that it was not making findings of fact or conclusions of law since none were requested. Therefore, Plaintiff's premise that the trial court based its judgment on parol evidence is not supported by references to the record.

■ Additionally, it does not appear to us that parol evidence would have been necessary for the trial court to conclude that the lease of the "Recomm Advisory Board" would include the software necessary to make it functional as a message board. To require that the description of the leased message board include a specific reference to software necessary to make it functional for the use for which it was leased would be akin to requiring that a lease of a new automobile must specify that it includes an engine or the internal computer system in order for it to be clear that a car that would run was what was intended.

■ Finally, we note that even if "Recomm Advisory Board" is not ambiguous on its face, that does not compel the conclusion that an ambiguity is not involved which would authorize the consideration of extrinsic evidence. Ambiguities in written instruments are of two kinds: (1)

patent, arising upon the face of the document, and (2) latent. *Royal Banks of Mo. v. Fridkin,* 819 S.W.2d 359, 362 (Mo. banc 1991). An ambiguity is patent if it arises through the analysis of the language of the agreement, and latent if language, which is plain on its face, becomes uncertain upon application. *General American Life Ins. Co. v. Barrett,* 847 S.W.2d 125, 131 (Mo. App. W.D.1993). A latent ambiguity, not being apparent on the face of the writing, must be developed by extrinsic evidence to show the real intent of the parties. *Royal Banks,* 819 S.W.2d at 362; *Smith v. Taylor-Morley, Inc.,* 929 S.W.2d 918, 923 (Mo. App. E.D.1996). The determination of whether a contract is ambiguous is a question of law. *Royal Banks,* 819 S.W.2d at 361. In determining ambiguity, the parol evidence rule does not exclude proof that an alleged contract omits a fundamental assumption upon which the agreement is made. *Sherman v. Deihl,* 193 S.W.3d 863, 866 (Mo.App. S.D.2006). Where ambiguity exists, whether latent or patent, the cardinal principle is to determine the intent of the parties. *Royal Banks,* 819 S.W.2d at 362. In order to do so, a court will consider the entire contract, subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contact, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other external circumstances that cast light on the intent of the parties. *Id.*

When the court can determine the meaning of a written contract without any guide other than knowledge of the simple facts on which, from the nature of language in general, its meaning depends, the terms of the contract will be deemed unambiguous. *State Farm Mut. Auto. Ins. Co. v. Esswein,* 43 S.W.3d 833, 841 (Mo.App. E.D.2000). If we were to hold

that the term "Recomm Advisory Board" is unambiguous would we be compelled to say that it means a message board that functions only as a red light? We think not. Rather, that term, from the four corners of the Lease, would be construed as meaning a *functioning* message board known as a "Recomm Advisory Board." If we were to accept Plaintiff's construction, how many other parts necessary to make it function could be deleted from the board and it still be considered a "Recomm Advisory Board"? We believe that, even without resort to parol evidence, the phrase "Recomm Advisory Board" means a message board that functions as such.

As indicated, Plaintiff argues that "Recomm Advisory Board" does not, on initial review, appear ambiguous on its face. However, here collateral matters and external circumstances render it uncertain, and thus, if it is ambiguous, qualifies it as a latent ambiguity. As indicated above, under those circumstances, extrinsic evidence is appropriate to show the real intent of the parties. The result is that even if the trial court considered the parol evidence of Defendant concerning what was intended in leasing the message board, it would not have been erroneous.

We fathom no error whether or not the trial court considered parol evidence concerning the meaning of "Recomm Advisory Board" and deny the point.

In its third point on appeal, Plaintiff alleges that entry of the judgment for Defendants was erroneous, because in a breach of contract case where Defendants admit the existence of a contract, the judgment "must be supported by competent and substantial evidence of a breach by Plaintiff in that (1) Defendants failed to offer evidence that the equipment described in the lease included software Plaintiff never delivered, the only defense raised by Defendants at trial, and (2) De-

fendants' prior representations in the lease application that they received all the equipment provided for in the lease and that the lessor's obligations were satisfactorily performed preclude a finding that Defendants did not receive all the equipment or that [Plaintiff's] obligations under the lease had not been satisfied."

Plaintiff first argues that since Defendants admitted the existence of a contract, a judgment in their favor was required to be supported by competent and substantial evidence of a breach by Plaintiff, and Defendants failed to offer evidence in support of their "only defense," that the equipment described in the lease included the software Plaintiff never delivered. This portion of the point is not well taken for at least two reasons.

■ First, Plaintiff cites no authority of any kind in support of this contention. Pursuant to Rule 84.04(e), a brief must contain an argument section that discusses the point relied on and shows how the principles of law and the facts of the case interact. *Selberg v. Selberg*, 201 S.W.3d 513, 516 (Mo.App. W.D.2006). An appellant also has an obligation to cite appropriate and available precedent if he expects to prevail, and, if no authority is available to cite, he should explain the reason for the absence of citations. *Thummel*, 570 S.W.2d at 687. When an appellant neither cites relevant authority nor explains why such authority is not available, the appellate court is justified in considering the points abandoned. *Selberg*, 201 S.W.3d at 516.

■ Second, this portion of the point is based on the alleged failure to offer evidence "that the equipment described in the lease included software Plaintiff never delivered." To the contrary, Ream did testify that she expected to receive the software necessary for the equipment to operate as a message board. For both of

these reasons, Plaintiff is entitled to no relief based on this contention.

In the second part of the point, Plaintiff contends that the following statement, signed on behalf of Defendant P.C. as a part of the "Lease Application" precludes a finding that Defendants did not receive all the equipment or that Plaintiff's obligations under the lease had not been satisfied:

> Lessee hereby acknowledges receipt of the equipment described in its Lease with Lessor (the "Equipment") and accepts the Equipment after full inspection thereof as satisfactory for all purposes of the Lease. Lessee acknowledges that Lessor has fully and satisfactorily performed all covenants and conditions to be performed by Lessor.

Plaintiff relies on the theory of an estoppel *in pais* in support of this contention, and cites cases such as *Grafeman Dairy Co. v. Northwestern Bank*, 315 Mo. 849, 288 S.W. 359, 364 (1926), in which the court said:

> This estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. It consists in holding for truth a representation acted upon, when the person who made it, or his privies, seek to deny its truth, and to deprive the party who has acted upon it of the benefit obtained.

As pointed out by Defendants, however, the *Grafeman* court also stated that "[a] necessary element of estoppel is that the party urging it must have done or re-

frained from doing something to his prejudice while relying on the conduct." *Id.* at 368.

The party asserting estoppel bears the burden of proving it, and each element must be proven by clear and satisfactory evidence. *Van Kampen v. Kauffman,* 685 S.W.2d 619, 625 (Mo.App. S.D. 1985). "One cannot set up another's act or conduct as the ground of an estoppel unless the one claiming it is misled or deceived by such act or conduct, nor can he set it up where he knew or had the same means of knowledge as the other as to the truth." *Id.*

In this case, the statement relied on by Plaintiff was contained in the "Lease Application" dated August 25, 1995. As indicated earlier, the contents of that application appear in black ink except that the "Lease Number" and "Date of Lease" were written in blue ink; the "Date of Lease" is listed as "9–5–95." Likewise, the written portions of the Lease Agreement appears in black ink except the description of the equipment as "Recomm Advisory Board Serial Number 15053," the signature of Plaintiff's Operations Director and the date "9–5–95" in a box titled "Accepted: Lessor," all of which were written in blue ink.

Defendant Ream testified that when she signed the Lease Application and Lease Agreement, Defendant P.C. had in fact not yet received the message board; one of the portions in blue ink were her handwriting; and the description of the equipment and the acceptance by the Lessor were all filled in after she signed the documents. This, together with the provision in the Lease Agreement that "[y]ou request that [Lessor] arrange delivery to you" demonstrates that Defendant P.C. did not, in fact, have the equipment when these documents were signed. That being the case, Plaintiff, having signed and filled in the portions in blue ink afterwards, could not and did not establish that it relied on the acknowledgement as contended in this portion of the point relied on. Plaintiff cites us to no other evidence in support of its estoppel argument other than the acknowledgement signed on behalf of Defendant P.C. This portion of the point is denied.

The judgment is affirmed.

BATES, C.J., and BARNEY, J., concur.